Suso DAVILA, Plaintiff,

v.

CITY OF CAMDEN, Scott Thomson, Orlando Cuevas, Inspector Michael Lynch, and Christine Jones–Tucker, Defendants.

Civil No. 11–554 (NLH)(AMD).

United States District Court,
D. New Jersey.

Signed Dec. 10, 2014.

Filed Dec. 11, 2014.

Law Offices Of Cheryl L. Cooper, Sewell, NJ, for plaintiff.

James H. Waller, Haddon Heights, NJ, for defendant City of Camden.

Jean Sharon Chetney, Jean S. Chetney, Attorney at Law, Woodstown, NJ, for the individual defendants.

### OPINION

HILLMAN, District Judge.

Presently before the Court is the motion of defendants for summary judgment on plaintiff's claims that his rights were violated when he spoke out against a police policy at a pre-shift roll call meeting. For the reasons expressed below, defendants' motion will be granted.

### *BACKGROUND*

Plaintiff, Suso Davila, a now-retired Camden City police sergeant, filed a complaint against defendants, the City of Camden;[1] Scott Thomson, City of Camden Police Chief; Orlando Cuevas, City of Camden Police Inspector; Michael Lynch, Deputy Chief of the City of Camden Police Department; and Christine Jones–Tuckers, the Business Administrator for the City of Camden, claiming that defendants violated his First Amendment rights and committed violations of the New Jersey Conscientious Employee Protection Act

("CEPA"), N.J.S.A. 34:19–1 et seq., when he was disciplined and transferred because he spoke out about a Camden Police Department policy regarding "directed patrols." As described by defendants, directed patrols were a police investigative tactic which required police officers to patrol targeted crime "hot spots" in an effort to concentrate police presence in areas of the city that were known high-crime areas. The policy required officers to "engage" members of the public who were not suspected of committing any offense in an attempt to obtain information about the community and make the police presence known in the community. The policy required officers to approach citizens in the neighborhoods and attempt to obtain information about criminal activity in the neighborhood, and also obtain personal identifying information from individuals if they agreed to provide it, such as the person's name, date of birth, residence, and social security number.

Plaintiff believed that the directed patrol policy was sound, but he took issue with one aspect of it. Plaintiff believed that the practice of collecting personal information from innocent citizens and commingling that information with personal information of suspected and known criminals was "illegal." Plaintiff also believed that the re-

---

**1.** Plaintiff's claims are asserted against the City of Camden, which is the same entity as the former Camden City Police Department. *Bonenberger v. Plymouth Township*, 132 F.3d 20, 25 n. 4 (3d Cir.1997) (a municipality and its police department are a single entity for the purposes of § 1983 liability). Plaintiff's claims against the individual defendants are in their individual and official capacities, and the official capacity claims are actually claims against the City of Camden. *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (official capacity suits "generally represent only another way of pleading an

action against an entity of which an officer is an agent"). As of May 1, 2013, the Camden City Police Department became defunct, and the County of Camden took over the policing of Camden. Because plaintiff's claims arose prior to the transition, the City of Camden is the proper party in this action. *See* The Camden County Police Department: FAQs, available at http://camdencountypd.org/wp-content/themes/ccpd/pdf/Police-FAQ.pdf, at page 3 ("Camden County would NOT be responsible for or cover in any way any and all legal challenges and costs associated with prior events attributable to the municipality that wishes to join a County police department.").

peated requests by police of innocent citizens for their personal information would expose the police officers and the department to lawsuits for harassment. In his capacity as a union board member, as vice-president of the Camden Organization of Police Superiors, and as a homeowner in Camden, plaintiff spoke out against the collection of personal information from regular citizens, and informed other Camden residents that they were not required to provide such personal information to a police officer simply because they were asked for that information from an officer.[2]

On March 17, 2009, plaintiff conducted roll call as he usually did at the beginning of the midnight shift. That day, defendant Lynch attended roll call to speak to the officers about the engagement of citizens in Camden. Plaintiff, along with several other officers, voiced their concerns about collecting personal information from citizens not suspected of any crime, recording that information on contact cards, and commingling that recorded data with information of suspected and known criminals that is supplied to the attorney general's office. Plaintiff claims that he was respectful in his criticism, while other officers were much more vocal.

Despite plaintiff's deferential and respectful expression of his view on the propriety of collecting personal information from regular Camden citizens, plaintiff claims that he was the victim of retaliation. Immediately following the meeting, plaintiff was sent home from work, where he remained on administrative leave, with pay, for three days. At the end of the three days, he was transferred to Central Complaint where he no longer supervised directed patrols, and he was placed on a different shift that caused him to lose a shift deferential in pay. Plaintiff was charged interdepartmentally with a violation of Rules and Regulations of the Camden Police Department Disciplinary Code, Chapter 8, Rule 8.1.6(k), "Insubordination or Serious Breach of Discipline." The specifications of the Preliminary Notice of Personnel Action provided:

> On March 17, 2009, Sergeant Suso Davila # 420, a seventeen year veteran of the Camden Police Department, interrupted Inspector Lynch during roll call and stated, "Officers cannot stop people for no reason." Inspector Lynch attempted to clarify the difference between investigative detentions and mere inquiries to which sergeant Davila contradicted Inspector Lynch's direction and stated, "You couldn't do this in any other town." Sergeant Davila also stated the department was violating the Attorney General guidelines by completing field contact cards. Inspector Lynch corrected Sergeant Davila to which Ser-

---

**2.** It appears that "directed patrols" fall into two categories. One type of police contact with an individual constitutes a constitutionally protected encounter, where an officer has reasonable suspicion to stop an individual suspected of committing a crime. In that type of encounter, an individual is not free to walk away and is required to provide identifying information. The other type of police contact with an individual—called a "mere inquiry"—does not implicate any constitutional rights, and a party is free to refuse to provide personal information and can walk away from the officer. Plaintiff's concern with the directed patrols is that the general public does not know that they may refuse to provide personal information, including social security numbers, to a police officer pursuant to a "mere inquiry," particularly when they are asked for the same information multiple times. (Pl. Dep., Def. Ex. B, at 71, 77, 79.) The Court notes that putting aside the place and manner in which they were raised, Sergeant Davila's concerns were not frivolous from a policy perspective. That having been said, the Court takes no position on the propriety of the directed patrol policy and need not do so in order the resolve plaintiff's First Amendment and NJ CEPA claims.

geant Davila laughed and stated, "That's why you guys should not have gotten rid of the 1A." Sergeant Davila's comments and demeanor were insubordinate, disruptive and adversely impacted the efficient operation of the Department, not to mention under minded Inspector Lynch's authority as Commanding Officer. Furthermore, instructing subordinates incorrectly regarding the legal exercise of their authority either exhibits his inexcusable lack of basic police knowledge or his intent to subvert the good order and effectiveness of the Department, either way Sergeant Davila failed to carry out his responsibilities as a first line supervisor. Such failure jeopardizes the safety of our officers as well as the citizens we are sworn to protect.

Def. Ex. C, Docket No. 25–8.

Plaintiff claims that his expression of his view of the directed patrol policy as it concerned the collection of personal information constituted speech protected under the First Amendment to the federal and New Jersey constitutions. He also claims that his reassignment and shift change were in retaliation for his protected speech, and also constituted a violation of NJ CEPA because he "blew the whistle" on the department's harmful activity.

Defendants have moved for summary judgment on all of plaintiff's claims. Plaintiff has opposed their motion.

## DISCUSSION

### A. Subject matter jurisdiction

Plaintiff has brought his claims pursuant to 42 U.S.C. § 1983, as well as pursuant to the New Jersey constitution and New Jersey state law. This Court has jurisdiction over plaintiff's federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over plaintiff's state law claims under 28 U.S.C. § 1367.

### B. Standard for Summary Judgment

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(a).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. *Id.* In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Industrial Crating Co.,* 358 F.3d 241, 247 (3d Cir.2004) (quoting *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Id.* Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party.

*Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. *Saldana v. Kmart Corp.,* 260 F.3d 228, 232 (3d Cir.2001).

## C. Analysis

### 1. First Amendment claims

■■■ It is well-established that a governmental entity " 'may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.' " *Dougherty v. School Dist. of Philadelphia,* 772 F.3d 979, 986 (3d Cir.2014) (quoting *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987)). To establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred. *Id.* (citation omitted).[3]

■■■ The Third Circuit recently noted that "the Supreme Court has reiterated time and time again, [that] 'free and unhindered debate on matters of public importance' " is " 'the core value of the Free Speech Clause of the First Amendment.' " *Id.* (quoting *Pickering v. Board of Education,* 391 U.S. 563, 573, 88 S.Ct. 1731, 20

L.Ed.2d 811 (1968)). Accordingly, "public employees do not surrender all their First Amendment rights by reason of their employment." *Id.* (quoting *Garcetti v. Ceballos,* 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)). "At the same time, the Supreme Court also aptly recognizes the government's countervailing interest— as an employer—in maintaining control over their employees' words and actions for the proper performance of the workplace. Thus, so long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.* (citation and quotation omitted).

■■■ Under this backdrop, a court must conduct a three-step inquiry to determine whether a public employee's speech is protected: (1) the employee must speak as a citizen, not as an employee, under the test established in *Garcetti* and recently reiterated by the Supreme Court in *Lane v. Franks,* — U.S. ——, ——, 134 S.Ct. 2369, 2378–80, 189 L.Ed.2d 312 (2014); (2) the speech must involve a matter of public concern; and (3) the government must lack an "adequate justification" for treating the employee differently than the general public based on its needs as an employer under the *Pickering* balancing test. *Id.*

■■■ In this case, even accepting that plaintiff's view of the police department's

---

**3.** For plaintiff's claims against the individual defendants acting in their personal capacity, the qualified immunity doctrine governs the analysis of those claims. "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards,* — U.S. ——, ——, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012). The qualified immunity analysis is a two-step process, where a court

must first decide whether the facts, taken in the light most favorable to plaintiff, establish that defendants' conduct "violated a constitutional right," and, second, whether that right was "clearly established" at the time of the challenged conduct. *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Because the Court finds that plaintiff cannot support a claim that defendants violated his constitutional rights, the qualified immunity analysis ends there.

collection of personal information from ordinary citizens involves a matter of public concern, plaintiff cannot meet the other two elements of his First Amendment retaliation claim. First, plaintiff's expression of his concerns about the data collection aspect of the directed patrols falls into the category of an employee speaking, rather than the speech of a citizen. Plaintiff states that he did not dispute the legality of gathering personal information from citizens pursuant to a "mere inquiry" stop by police. Plaintiff agrees that police officers are permitted to engage in this interaction with anyone on the street.[4] Instead, plaintiff was concerned that lawsuits could be filed against him and his fellow officers by citizens because they felt harassed. He was also generally concerned about the commingling of criminal information with innocent citizen information. These concerns evidence a police sergeant's worry for his department's exposure to lawsuits by citizens who do not understand the legality of the police inquires, rather than for violations of citizens' rights, which plaintiff agrees was not occurring as a matter of policy.[5]

Moreover, although plaintiff expressed these concerns to his neighbors and members of his private organizations, no evidence shows that he was retaliated against

---

**4.** As a police officer, plaintiff was required to understand the parameters of detaining and speaking to citizens. *See, e.g., Ashcroft v. al-Kidd,* — U.S. —, —, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011) ("A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."). The law on police speaking with citizens is clearly established:

> Even a brief detention can constitute a seizure. *Terry v. Ohio,* 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, "[t]he police do not violate the fourth amendment by 'merely approaching an individual on the street or in another public place, by asking him [or her] if he [or she] is willing to answer some questions....'"

[*State v.*] *Davis,* 104 N.J. [490] at 497, 517 A.2d 859 [(1986)] (quoting *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983)). On the other hand, "mere field interrogation" is constitutional "so long as the officer does not deny the individual the right to move." *State v. Sheffield,* 62 N.J. 441, 447, 303 A.2d 68, cert. denied, 414 U.S. 876, 94 S.Ct. 83, 38 L.Ed.2d 121 (1973). A police officer may conduct an investigatory stop if, based on the totality of the circumstances, the officer had a reasonable and particularized suspicion to believe that an individual has just engaged in, or was about to engage in, criminal activity. *Terry,* 392 U.S. at 21, 88 S.Ct. 1868. This Court has upheld the constitutionality of a temporary street detention based on less than probable cause. *State v. Stovall,* 170 N.J. 346, 788 A.2d 746, 752 (2002); *Florida v. Royer,* 460 U.S. 491, 497–98, 103 S.Ct. 1319, 75 L.Ed.2d 229 (U.S. 1983) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.").

**5.** In his opposition to defendants' motion for summary judgment, plaintiff provides an affidavit, in which he states, "I reasonably believe that the stopping of citizens and members of the public on the streets of Camden, asking them all kinds of questions including information about crimes, and criminal activity, and personal information including their social security numbers, was a violation of the Fourth Amendment." (Pl. Ex. M ¶ 18.) This statement in his affidavit is in complete contrast to his deposition testimony. There, when asked, "What did you think would happen if we put information of people who are not criminals with information of people who

for that expression.[6] The evidence in the record demonstrates that it was in his expression of his concerns at the police department's March 17, 2009 roll call that resulted in the alleged retaliation. Plaintiff disputes that his expression of his views on the information gathering policy was not delivered in a respectful and deferential manner, but the undisputed evidence in the record shows that plaintiff's discipline was for the time, place and manner in which he delivered his opinions rather than for the content of his views. Plaintiff was as supervisory officer who was in charge of ensuring that the officers he supervised understood their duties, including the parameters of the directed patrol policy. (*See* Pl. Dep., Def. Ex. B, at 79, explaining his understanding of the difference between an "investigative detention" and a "mere inquiry.") Plaintiff was disciplined for insubordination because his comments and demeanor were deemed by his supervisors to be disruptive and undermining, and an incorrect instruction to subordinates on the legal exercise of their authority. (Def. Ex. C, Docket No. 25–8.)

As the Third Circuit reiterated,

*Garcetti* establishes that when public employees speak "pursuant to their official duties," that speech does not receive First Amendment protection. This is because, when doing so, "employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." The rationale underlying this distinction "promote[s] the individual and societal interests that are served when employees speak as citizens on matters of public concern," while "respect[ing] the needs of government employers attempting to perform their important public functions."

*Dougherty*, 772 F.3d 979, 987–88 (quoting *Garcetti*, 547 U.S. at 421, 126 S.Ct. 1951). Plaintiff has not provided any proof, other than his own perception of the events during the roll call, to cast doubt that his conduct was not as described in the Notice of Disciplinary Action.[7]

 Relatedly, plaintiff has failed to demonstrate that defendants lacked an

---

were criminals?" plaintiff answered, "Lawsuits ... based on gathering information, harassment. My concern was harassment. Why are we trying to get the information? That was my big concern; us getting sued[,] by the general public. The ones we're stopping." (Pl. Dep., Def. Ex. B, at 71.; *see also id.* at 77.) When asked, "Is it your contention that any requirement of the directed patrol policy as of March 17th of 2009 was illegal?", plaintiff responded, "No." When asked, "Was it your position at any time that you were given an illegal order?", plaintiff answered, "No." (*Id.* at 77.) "[C]onclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir.2009) (citations omitted). Plaintiff's affidavit is this type of submission.

6. In his affidavit in support of his opposition to defendants' motion for summary judgment,

plaintiff states that defendants were well aware that he was against the directed patrol policy. (Pl. Ex. M ¶ 7.) Plaintiff does not provide any other evidence to demonstrate that statement. To defeat summary judgment, plaintiff must identify specific facts and affirmative evidence that contradict those offered by the moving party, and plaintiff must do more than just rest upon mere allegations, general denials, or vague statements. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir.2001).

7. In an attempt to support his claim that he calmly and respectfully voiced his concern about the directed patrol policy, rather than how it was described by defendant Lynch, plaintiff contends that Captain Grimes, who attended the roll call meeting and subsequently sent plaintiff home at the direction of defendant Lynch, did not agree with Lynch's report of the incident, he did not agree with

"adequate justification" for treating him differently than the general public based on its needs as an employer under the *Pickering* balancing test. A public employer has a legitimate and countervailing interest, as an employer, in "promoting workplace efficiency and avoiding workplace disruption," and a public employer may limit an employee's speech where it "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." *Dougherty*, 772 F.3d 979, 991 (quoting *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891). Plaintiff has not offered sufficient evidence to demonstrate that his discipline was in retaliation for protected speech, and not an effort to promote workplace efficiency and avoiding workplace disruption.[8]

### 2. NJ CEPA

■ The New Jersey Legislature enacted CEPA to "protect and encourage employees to report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Abbamont v. Piscataway Township Bd. of Educ.*, 138 N.J. 405, 650 A.2d 958, 971 (1994). In furtherance of that goal, the statute provides, in relevant part: An employer shall not take any retaliatory action against an employee because the employee does any of the following: ... c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes: (1) is in violation of a law, or a rule or regulation promulgated pursuant to law ...; (2) is fraudulent or criminal; or (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment. N.J.S.A. 34:19-3(c).

■ A plaintiff who brings a cause of action pursuant to N.J.S.A. 34:19-3(c) must demonstrate that: (1) he or she reasonably believed that his or her employer's conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) he or she performed a "whistle-blowing" activity described in N.J.S.A. 34:19-3(c); (3) an

the punishment, and he altered his own report at the behest of Lynch. (Pl. Statement of Facts ¶ 32.) The hearing transcript testimony of Captain Grimes cited does not, however, support that proposition. (Pl. Ex. G at 77–78.) The hearing testimony of Lieutenant John Sosinavage, who was in charge of internal affairs administrative hearings and investigations, testified that when he reviewed defendant Lynch's report of the roll call meeting with Captain Grimes, Captain Grimes felt that plaintiff's conduct was not as severe as defendant Lynch felt it was, but that Grimes perceived plaintiff's demeanor to be "unprofessional," spilled over to the other officers, and he did not stop talking when the conversation should have ended. (Pl. Ex. D, at 14–17.) Plaintiff notes that Sosinavage subsequently filed a lawsuit against Lynch. These minor disputes as to the tone of Plaintiff's objections are not material. Nowhere does Plaintiff dispute that he expressed his concerns during a meeting designed to insure the officers under his command followed the disputed policy. Whether he shouted or whispered, his expressed views undermined departmental goals.

8. For the same reasons, plaintiff's First Amendment violation claim under the New Jersey constitution is also unavailing. *See E & J Equities, LLC v. Board of Adjustment of Tp. of Franklin*, 437 N.J.Super. 490, 100 A.3d 539, 549 n. 5 (N.J.Super.App.Div.2014) (explaining "[b]ecause we ordinarily interpret our State Constitution's free speech clause, N.J. Const. art. I, ¶ 6, to be no more restrictive than the First Amendment to the United States Constitution, we rely on federal constitutional principles in interpreting the free speech clause of the New Jersey Constitution," but noting that two exceptions to the general rule are political expression at privately-owned-and-operated shopping malls).

adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action. *Kolb v. Burns,* 320 N.J.Super. 467, 727 A.2d 525, 530 (N.J.Super.Ct.App.Div.1999) (citation omitted).

 At the March 17, 2009 roll call meeting, plaintiff voiced his objection to the information gathering procedure he and his fellow officers were instructed to undertake as part of their directed patrols. Even accepting as true that plaintiff suffered an adverse employment action as a result, plaintiff's CEPA claim fails for the same reasons as his First Amendment retaliation claims. As explained above, the evidence in the record shows that it was the manner, time, and place in which plaintiff expressed his concerns with the information gathering policy, and not for the content of his views, that subjected him to discipline. *See Connick v. Myers,* 461 U.S. 138, 152–53, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (citation omitted) ("When a government employee personally confronts his immediate superior, the employing agency's institutional efficiency may be threatened not only by the content of the employee's message but also by the manner, time, and place in which it is delivered."); *see also Fleming v. Correctional Healthcare Solutions, Inc.,* 164 N.J. 90, 751 A.2d 1035, 1039 (2000) (explaining that the requirement that a whistleblower submit her complaint to a supervisor is not limited to

her immediate supervisor, and observing, "This does not mean that an employer may not fire an employee, even a whistleblower, who is unreasonable in expressing his or her complaints. For example, a state employee who repeatedly called the Governor at the Governor's residence late at night to report violations of law at a state agency could justly be said to be insubordinate if requested not to do so.").

Additionally, the record evidence does not demonstrate that at the time of the roll call meeting plaintiff could point to a law, rule or regulation that the information gathering policy was violating. The Court does not question that plaintiff felt that the police's often duplicative obtaining of personal information from regular citizens on the street simply for the sake of fulfilling a quota was not effective or desirable for many reasons, but the evidence does not demonstrate that plaintiff believed that the police were violating the law by doing so.[9] In short, the evidence in the record does not support the elements of a CEPA violation.

### CONCLUSION

For the reasons expressed above, defendants are entitled to summary judgment on all of plaintiff's claims against them. An appropriate Order will be entered.

---

9. Again, as noted above, plaintiff's contention in his complaint and affidavit filed in opposition to summary judgment that the directed patrol policy, as implemented by the Camden police, was a violation of the citizens' Fourth Amendment rights, does not demonstrate that as of March 17, 2009, plaintiff viewed the policy as violating citizens' constitutional rights. Plaintiff has not pointed to any evidence that as of March 17, 2009, the information gathering part of the directed patrol policy required officers to exceed the bounds of

the Fourth Amendment, which plaintiff was required to understand. *See supra* note 4. In other words, because plaintiff, as a police officer, was required to know the clearly established law on an officer's authority to stop and question citizens, he would have been capable of articulating how the information gathering policy was violating the Fourth Amendment rights of Camden citizens, rather than generally stating that it was "improper," "illegal," or "harassing."