**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3622-23

GARDEN STATE OUTDOOR, LLC,

    Plaintiff-Appellant,

v.

ZONING BOARD OF ADJUSTMENT
OF MIDDLE TOWNSHIP and THE
TOWNSHIP OF MIDDLE TOWNSHIP,

    Defendants-Respondents.

_____

Argued November 6, 2025 – Decided February 25, 2026

Before Judges Mayer, Paganelli and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Cape May County, Docket No. L-0304-22.

Justin D. Santagata argued the cause for appellant (Cooper Levenson, attorneys; Justin D. Santagata and Samantha Edgell, on the briefs).

Michael V. Madden argued the cause for respondents (Madden & Madden, PA, attorneys; Michael V. Madden, on the brief).

PER CURIAM

This appeal follows an application by plaintiff Garden State Outdoor LLC (Garden State) to defendant Zoning Board of Adjustment of Middle Township (Board), for variance relief to install an off-premises billboard contrary to the Township of Middle Township's (Township) zoning ordinance. After the Board denied the application, Garden State filed an action in lieu of prerogative writs seeking to declare the ordinance unconstitutional and vacate the Board's variance denial as arbitrary, capricious, or unreasonable.

Garden State appeals from the trial court's order denying its motion for summary judgment and granting the Township's and the Board's cross-motions for summary judgment determining the Township ordinances are constitutional. In addition, Garden State appeals from the trial court's order finding the Board's denial of its application for variance relief was not arbitrary, capricious, or unreasonable, and dismissing its action in lieu of prerogative writs.

Because we conclude the Township's ordinances are constitutional and the Board's decision to deny the variance was not arbitrary, capricious, or unreasonable, we affirm. We consider Garden State's constitutional arguments under section I and its variance arguments under section II.

A-3622-23

I.

A.

We glean the undisputed facts from the record on the parties' motions for summary judgment. In 1964, the Township's Master Plan[1] detailed the history of the Township and emphasized the importance of preserving its physical characteristics. It also recognized tourism provided a lucrative industry in the Township.

In 1969, the Township adopted the "Zoning Ordinance of Middle Township" (Ordinance). Article II of the Ordinance provided:

> In their interpretation and application the provisions of this Ordinance shall be held to be the minimum requirements adopted for the promotion of the public health, safety and welfare. To protect the public, among other purposes, such provisions are intended to provide for the lessening of traffic congestion; the securing of safety from fire, panic and other dangers; the protection of health, morals and the general welfare; the securing of adequate light and air; the prevention of overcrowding of land and buildings; the avoidance of undue concentration of population; the conservation of property values and the encouragement

---

[1] "In New Jersey, the master plan is the centerpiece of land use planning. Pursuant to the M[unicipal] L[and] U[se] L[aw (MLUL)], it is 'a composite of one or more written or graphic proposals for the development of the municipality.' [(Quoting)] N.J.S.A. 40:55D-5. It may be adopted by a municipal planning board only after a public hearing, [(citing)] N.J.S.A. 40:55D-28." Nigro v. Plan. Bd. of Saddle River, 122 N.J. 270, 279 (1991).

of the most appropriate use of land throughout the Township.

Further, "signs" were addressed in Article XVIII. Section one of this Article provided:

It is the intent of the Township in the creation of requirements for signs and outdoor advertising, to make provision for the advertising of goods and services in such a manner that property values and the general safety and welfare of the community's residents and visitors will be preserved and protected.

Further, Section two "Permitted Signs" provided:

Signs, billboards, and all forms of outdoor advertising shall not be erected, placed, painted, or hung in any [Zoning] District except as hereinafter provided[:]

a. General provisions of all districts[:]

(1) All signs shall be located on the same property with the use, firm, facility, business, product, service or organization they advertise, unless otherwise provided in this Ordinance . . . .

Moreover, Section four "Non-Conforming Signs" provided:

Signs, billboards[,] and all forms of outdoor advertising existing at the time of adoption of this Ordinance which are not in conformance with its requirements shall not be continued, replaced, repainted, or re-hung in any district except as hereinafter provided.

4

In the Township's September 1991 Master Plan, its stated goals included: "[m]aintain[ing] the character and integrity of each community within the Township"; "[p]romot[ing] consistency among local, county . . . bodies"; and "[p]reserv[ing] and enhanc[ing] the historic, cultural, and recreational aspects and the visual environment of the Township."

In 1995, the Township amended the Ordinance and left the billboard prohibition in place. In its 1996 "Master Plan Re-Examination Report," the Township reiterated the goals from the 1991 Master Plan and stated "[r]ecent commercial developments within the . . . [applicable a]rea have been required to adhere to stringent standards regarding signage. . . ."

In 2002, the Township again amended the Ordinance to provide a "general sign requirement" as follows:

> Any sign proposed to be placed in the Township . . . is subject to review and approval . . . . The regulation of signs under this Article is intended to ensure that proposed signage: is compatible with current surrounding land uses, creates a more attractive economic and business climate within the commercial and industrial areas of the Township, protects and enhances the physical appearance of all areas and reduces the distractions, obstructions and hazards to pedestrian and auto traffic caused by the indiscriminate placement and use of signs.

A-3622-23

In its 2003 Master Plan, the Township repeated the goals stated in its 1991 and 1996 plans. Further, in its 2010 "Master Plan Re[-]examination Report," the Township reiterated its 2003 goals and, as to its "Historic, Cultural and Aesthetic Resources," stated it sought to "[p]reserve the unique and cultural resources of the Township that provide historical continuity" and "[p]reserve and enhance the historic and cultural . . . aspects and the visual environment of the Township." The Township noted the importance of its aesthetic resources in its 2010 "Natural Resources Inventory."

In 2012, the Township again amended the Ordinance. The introduction to the amendment states: "[T]he 2010 Master Plan lists as one of its goals and objectives to '[u]pdate sign standards that promote safety while discouraging sign proliferation[.]'" The Ordinance prohibits "billboards." The purpose of the sign regulation was to:

> (1) Ensure that the proposed signage is compatible with surrounding land uses[;]
>
> (2) Create a more attractive economic and business climate within the commercial areas of the Township[;]
>
> (3) Protect and enhance the physical appearance of all areas[;]
>
> (4) Reduce the distractions, obstructions and hazards to pedestrian and auto traffic caused by the indiscriminate placement and use of signs[;]

6

(5) To protect the historic character of the Cape May Court House Overlay District by Ensuring that signage is aesthetically compatible[; and]

(6) Effectuate the [M]aster [P]lan goal to "[u]pdate sign standards that promote safety while discouraging sign proliferation."

In its 2020 "Master Plan Re[-]examination Report," the Township stated the 2010 goal to "[u]pdate sign standards that promote safety while discouraging sign proliferation . . . was accomplished through updated sign standards" and the goal to "preserve and enhance the historic and cultural . . . aspects and visual environment of the Township" was "a continuing goal."

The 2022 Cape May County's Comprehensive Plan stated its "Vision Statement and Goals and Objectives" were to "build upon its strengths and grow in an environmentally and economically sustainable manner, while inspiring actions that preserve what makes it a special place to live, work, and play."

B.

Garden State moved for partial summary judgment to declare the Township's ordinance banning billboards unconstitutional. Garden State argued the billboard ban was both facially unconstitutional and an impermissible time, place, and manner regulation of speech. The Township and Board cross-moved for partial summary judgment seeking to have the billboard ban deemed

7

constitutional. The trial court denied Garden State's motion and granted the Township's and Board's cross-motions.

The trial court issued a thirteen-page written decision accompanying its order. In its decision, the court determined the ordinance was not facially unconstitutional. The trial court found the Township "is a historical community . . . such that its interests in aesthetics and historical authenticity are important government interests." The court found that "dating back to 1964," the "Township['s] Master Plan" noted the Township's "concern for preserving the aesthetic nature of its community." Moreover, the preservation goals were "re-examined on numerous occasions." The trial court also found the Township had a "strong need to maintain its governmental interests through its longstanding town-wide ban of all billboards that [w]as . . . established and consistently updated since 1969." The trial court rejected the idea that the Township was "simply invoking aesthetics" to support the billboard ban. Moreover, it determined "[t]he Township's content-neutral blanket prohibition of billboards [wa]s constitutional because it serve[d] an important government interest and d[id] not burden any more speech than necessary to achieve its goal."

Next, the trial court rejected Garden State's argument that the ordinance was unconstitutional because it was not a reasonable time, place, or manner

regulation. The trial court applied the Clark/Ward[2] test as required by E & J Equities, LLC v. Board of Adjustment of the Township of Franklin, 226 N.J. 549 (2016). The trial court stated it was "satisfied" the ordinance was "content neutral[] and narrow[ly] tailor[ed] to serve a recognized and identified government interest." Further, the court found:

> The only form of communication restricted by the Township's Ordinance is off-premises advertising, electronic billboards and those that do not comply with certain height and width requirements. [Garden State] ha[s] numerous alternative means at their disposal as mentioned in Interstate Outdoor Advertising, L.P. v. Zoning Board of Mount Laurel, 706 F.3d 527, 535 (3d Cir. 2013), including mail, internet, on-premises advertising, radio, etc.
>
> [(Citation reformatted).]

Further, the court held the ordinance left open alternative channels of communication, such as "on-premises signs, internet advertising, direct mail, radio, newspapers, television, advertising circulars, advertising flyers, commercial vehicle sign advertising, and public transportation advertising."

---

[2] Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288 (1984); Ward v. Rock Against Racism, 491 U.S. 781 (1989).

C.

On appeal, Garden State argues the trial court erred because the Township's ordinance is facially unconstitutional under Bell v. Stafford, 110 N.J. 384 (1988), and, even if the Township can overcome facial unconstitutionality, the ordinance cannot pass a constitutional challenge as a reasonable time, place, and manner regulation under Clark/Ward.

We review the grant of summary judgment de novo, applying the same legal standards as the trial court. Green v. Monmouth Univ., 237 N.J. 516, 529 (2019). Under Rule 4:46-2(c),

> [t]he judgment or order sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law. An issue of fact is genuine only if, considering the burden of persuasion at trial, the evidence submitted by the parties on the motion, together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact.

"The factual findings of a trial court are reviewed with substantial deference on appeal, and are not overturned if they are supported by 'adequate, substantial and credible evidence.'" Manahawkin Convalescent v. O'Neill, 217

10

N.J. 99, 115 (2014) (quoting Pheasant Bridge Corp. v. Twp. of Warren, 169 N.J. 282, 293 (2001)).

"If there is no genuine issue of material fact, we must then 'decide whether the trial court correctly interpreted the law.'" Depolink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). We review issues of law de novo and accord no deference to the trial judge's conclusions of law. See Nicholas v. Mynster, 213 N.J. 463, 478 (2013) (On a de novo review, a reviewing court will not "defer to interpretive conclusions by the trial court."). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Zaman v. Felton, 219 N.J. 199, 216 (2014) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

In considering the constitutionality of a government regulation affecting speech, we begin with the First Amendment of the United States Constitution which provides: "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I. The New Jersey Constitution, Article I, Paragraph 6 provides: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law

shall be passed to restrain or abridge the liberty of speech or of the press. . . ." N.J. Const. art. I, ¶6. "Because our State Constitution's free speech clause is generally interpreted as co-extensive with the First Amendment, federal constitutional principles guide [our] analysis." E & J Equities, 226 N.J. at 568 (quoting Twp. of Pennsauken v. Schad, 160 N.J. 156, 176 (1999)).

Facially Unconstitutional

Garden State contends the trial court erred in concluding the ordinance was not facially unconstitutional because this matter is controlled by Bell. Garden State asserts that "Bell struck down this exact ban" and thus the court "need go no further." (Emphasis omitted). We disagree.

In Bell, the New Jersey Supreme Court considered the "first amendment and freedom of speech concerns" that arose from the "enactment and enforcement of an ordinance declaring that '[b]illboards, signboards, and off-premises advertising signs and devices [we]re prohibited within any zoning district of the Township.'" 110 N.J. at 387 (first alteration in original).

The Court stated when "an enactment directly impinges on a constitutionally protected right . . . [c]ourts are far more demanding of clarity, specificity and restrictiveness with respect to legislative enactments that have a demonstrable impact on fundamental rights." Id. at 395. Therefore, when "an

ordinance infringes on a fundamental right, 'the burden is upon the municipality to articulate the objectives of [the] . . . ordinance.'" Ibid. (alteration in original) (quoting Zilinsky v. Zoning Bd. of Adjustment of Verona, 105 N.J. 363, 371 (1987)). Further, "[t]he municipality must satisfactorily demonstrate a legitimate governmental interest that is to be served by the enactment and demonstrate a reasonable factual basis indicating that the regulation advances the governmental interest and is no more expansive than necessary in advancing that interest." Ibid.

The Court noted "[i]t reasonably appear[ed] from the record that the curtailment effected by the ordinance would apply to both commercial forms of expression as well as noncommercial speech, which could include political expressions." Ibid. Thus, "the ordinance directly and drastically encroache[d] on a fundamental constitutional interest, freedom of speech and expression" and "[b]ecause noncommercial speech [wa]s implicated, the burden of overcoming the charge of constitutional invalidity [wa]s particularly strenuous." Ibid.

In considering the record, the Court determined "[t]he ordinance fail[ed] to reveal either its particular governmental objectives or its factual underpinnings." Id. at 396. Instead, "the record [wa]s almost completely devoid of any evidence concerning what interests . . . [we]re served by the ordinance

13

and the extent to which the ordinance ha[d] advanced those interests." Ibid. The Court contemplated that "preserving aesthetics" and "promoting traffic safety" could be legitimate interests. Ibid. However, even assuming the presence of those interests, "there ha[d] been no demonstration of the factual basis for . . . a total municipal-wide ban." Ibid. The Court stated "[t]his clearly implicate[d] an important prong in the test of constitutional validity: that this ordinance constituted the least restrictive means possible by which to serve such an interest." Id. at 396-97.

In addition, the Court found "there ha[d] been no adequate showing that the ordinance left open alternative means of communication with the audience that was reached by the medium that [wa]s prohibited by the ordinance," id. at 397, and there is a "burden of showing that there were reasonably equivalent forms of communication available." Ibid.

Therefore, the Court was "constrained to declare [the ordinance] facially unconstitutional" because there was a "failure to justify the passage of such a broad and encompassing ordinance that substantially curtail[ed] freedom of speech and expression." Id. at 398.

Nevertheless, the Court noted:

> This does not mean that [a governmental entity] is incapacitated from enacting an ordinance seeking to

14

further a proper governmental objective and suitably restricted to meet that objective and satisfy the constitutional imperatives . . . in light of the problems pecul[i]ar to that municipality. Our only determination here is that the ordinance in question facially infringes on a fundamental right without sufficient support in the record to justify its validity.

[Ibid.]

Therefore, Bell stands for the proposition that a government ban on billboards that is not supported by actual interests that are tethered to the ban, and fails to offer alternative means of communication, will not facially withstand constitutional scrutiny. Bell does not sweep as broadly as Garden State suggests, that is, to nullify all billboard prohibitions. Indeed, Bell held the opposite when there is "a proper governmental objective and [regulation] suitably restricted to meet that objective" are present. Ibid.

Here, applying Bell, we conclude the Township's ordinance is not facially unconstitutional. First, there is no factual dispute regarding the Township's historic and substantial interest in protecting its aesthetics. The Township codified this interest nearly sixty years ago and has consistently reaffirmed its interest in preserving the municipality's aesthetic qualities in the years since. Moreover, the ordinance prohibiting off-premises billboards is reasonably suited

to achieve the goal of maintaining aesthetics while allowing for alternative means of communication.

Time, Place, and Manner

Garden State contends the Township's billboard ban fails the Clark/Ward time, place, and manner test.  Garden State acknowledges the ordinance is content neutral.  Further, Garden State notes "it is certainly true and correct that 'aesthetics' are a substantial interest."  However, Garden State argues the ban is not narrowly tailored to aesthetics.  Moreover, as to reasonable alternative means of communication, Garden State argues "[m]ail takes days"; "[i]t is not clear what the trial court meant by 'internet'"; "'[o]n-premises advertising' is literally the opposite of off-premises"; and "[r]adio is not locale-specific or triggered by passing through an area."  (Emphasis omitted).

In E & J Equities, the New Jersey Supreme Court considered an "ordinance that permit[ted] billboards, subject to multiple conditions, in a zoning district proximate to an interstate highway but expressly prohibit[ed] digital billboards anywhere in the municipality."  226 N.J. at 556.

The Court noted:

> Billboards of any kind are subject to considerable regulation.  Regulations on billboards are justified because "signs take up space and may obstruct views, distract motorists, displace alternative uses for land,

and pose other problems that legitimately call for regulation. It is common ground that governments may regulate the physical characteristics of signs[.]"

[Id. at 567 (alteration in original) (quoting City of Ladue v. Gilleo, 512 U.S. 43, 48 (1994)).]

The Court "conclude[d] that an ordinance or statute regulating signs, including billboards of any form, and affecting commercial as well as noncommercial speech should be examined in accordance with the Clark/Ward time, place, and manner standard." Id. at 580. Under that standard, the government, "must demonstrate that the prohibition . . . is content neutral, that it is narrowly tailored to serve a recognized and identified government interest, and that reasonable alternative channels of communication exist to disseminate the information sought to be distributed." Id. at 582 (citing Ward, 491 U.S. at 791; Clark, 468 U.S. at 293).

The Court explained to determine "whether an ordinance is narrowly tailored, the inquiry is whether it 'promotes a substantial government interest that would be achieved less effectively absent the regulation.'" Ibid. (quoting Ward, 491 U.S. at 799). Further, "[a] restriction on speech may not substantially burden more speech than necessary to further the government interest, but identification of another alternative that might be less restrictive of speech to achieve the desired end does not render the ordinance invalid." Ibid. (citing

17

Ward, 491 U.S. at 798-99).  The Court "recognize[d] that the Township was not required to adopt the least restrictive means to further its interests."  Id. at 584; see Ward, 491 U.S. at 798 ("Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so.").

The Court stated, "there c[ould] be little, if any, debate that the [o]rdinance [wa]s content neutral."  Id. at 582.  Indeed, the Court stated the "ban of digital billboards addresse[d] a manner of communication, not its content." Ibid.  "[H]owever, in the face of a record founded only on unsupported suppositions, fears, and concerns," the Court did not "address whether the course taken by the governing body [wa]s reasonable under all of the circumstances." Id. at 585.

Further, the Court "acknowledge[d] that aesthetics and public safety are generally considered to be substantial governmental interests, particularly in the context of regulations affecting billboards."  Id. at 556.  Nevertheless, "simply invoking aesthetics and public safety to ban a type of sign, without more, does not carry the day."  Id. at 557.  Instead, "the record must support, to some degree,

18

the interests that the municipality seeks to protect or advance," ibid., and "there must be a modicum of support for the invoked government interest." Id. at 583. In this respect, the Court concluded the record was "founded only on unsupported suppositions, fears, and concerns." Id. at 585. It stated, "a governing body . . . cannot simply invoke those interests with scant factual support informing its decision-making and expect to withstand a constitutional challenge." Ibid.

As it did in Bell, the Court noted the township was not precluded from adopting a regulation. It stated:

> We do not suggest that no municipal restriction on off-premises digital billboards or multiple message centers can pass constitutional muster. . . . [W]e do not consider the ban adopted by the [t]ownship a complete ban on a form of communication but rather a restriction on a subset of off-premises signage. A more robust factual record in support of the cited government interests deemed substantial may satisfy the Clark/Ward standard.
>
> [Ibid.]

Here, the parties agree that the Township's ordinance is content neutral. We determine there is no basis to disagree with their positions. Nevertheless, we add that in City of Austin, Texas v. Reagan National Advertising of Austin, LLC, the United States Supreme Court noted "thousands of jurisdictions around

19

the country . . . regulate[] signs that advertise things that are not located on the same premises as the sign, as well as signs that direct people to offsite locations. These are known as off-premises signs, and they include, most notably, billboards."  596 U.S. 61, 64 (2022).

In City of Austin, "the [c]ity's sign code defined the term 'off-premise sign' to mean 'a sign advertising a business, person, activity, goods, products, or services not located on the site where the sign is installed, or that directs persons to any location not on that site.'"  Id. at 66.  The Court held "the . . . off-premises distinction requires an examination of speech only in service of drawing neutral, location-based lines.  It is agnostic as to content.  Thus, absent a content-based purpose or justification, the City's distinction is content neutral and does not warrant the application of strict scrutiny."  Id. at 69.

The Court explained:

> [E]nforcing the . . . challenged sign code provisions requires reading a billboard to determine whether it directs readers to the property on which it stands or to some other, offsite location. . . . [T]he City's provisions at issue here do not single out any topic or subject matter for differential treatment.  A sign's substantive message itself is irrelevant to the application of the provisions;  there  are  no  content-discriminatory classifications  for  political  messages,  ideological messages, or directional messages concerning specific events,  including  those  sponsored  by  religious  and nonprofit  organizations.   Rather,  the  . . .  provisions

20

distinguish based on location: A given sign is treated differently based solely on whether it is located on the same premises as the thing being discussed or not. The message on the sign matters only to the extent that it informs the sign's relative location. The on-/off-premises distinction is therefore similar to ordinary time, place, or manner restrictions.

[Id. at 71.]

Here, we similarly conclude the Township's ordinance is content neutral. However, that conclusion "does not end the First Amendment inquiry." Id. at 76.

Under Clark/Ward, we next consider whether the ordinance "is narrowly tailored to serve a recognized and identified government interest." E & J Equities, 226 N.J. at 582. See also City of Austin, 596 U.S. at 76. In this respect, we do not disturb the trial court's factual finding, amply supported in the record, that the Township "is a historical community . . . such that its interests in aesthetics and historical authenticity are important government interests." The Township memorialized these interests nearly sixty years ago and has re-examined and reaffirmed these interests in the years since. We conclude the Township has a historical and substantial interest in preserving its aesthetics. Further, we conclude the Township's prohibition of off-premises billboards is narrowly tailored to address its interests.

21

Lastly, under Clark/Ward, we consider whether "reasonable alternative channels of communication exist to disseminate the information sought to be distributed." Ibid. The requirement cannot be satisfied by requiring the Township to establish the banned speech can be exactly replicated by an alternative channel of communication. To hold the Township to that standard would undermine any regulation. "[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 647 (1981). Instead, restrictions must "leave open ample alternative channels for communication of the information." Clark, 468 U.S. at 293. By applying this standard, we conclude the Township satisfied the "reasonable alternative" prong under Clark/Ward.

Here, applying Clark/Ward, we conclude the Township's ordinance satisfies the time, place, and manner test.

## II.

Garden State contends that if the ordinance is declared unconstitutional, its intended use would be permitted, and a remand is necessary for the Board to consider its application. Based on our foregoing constitutional analysis, we reject this contention without further comment.

In addition, Garden State argues the trial court erred in upholding the Board's denial of its application because the Board lacked substantial evidence for the denial.  We consider the merits of this argument.

We glean the relevant facts and procedural history from record before the Board.  Garden State's application sought

> a . . . use variance to permit two principal uses on one property, a D(1) use variance to permit an electronic message billboard, 'C' variance relief in relation to maximum sign height (20ft. is permitted whereas 45ft. is proposed), maximum number of freestanding signs (1 freestanding sign is permitted whereas 2 freestanding signs are proposed), and maximum sign are (40[ square foot] is permitted whereas 378[ square foot] is proposed), and waivers in relation to providing a community impact statement, a traffic study, and an environmental impact statement.

In its memorializing resolution, the Board stated it gave careful consideration to Garden State's application, testimony, and evidence.  It noted "[t]he subject property is located in the Township's TC (Town Center) zoning district and it is currently developed with a motel."  Garden State was "proposing to implement a second principal use, an electronic message billboard, at the subject property."  The resolution noted "[b]illboards are a prohibited use throughout the Township necessitating a use variance."  In addition, the Board's

23

resolution stated "[a] use variance [wa]s also required in order to permit a second principal use on one site."

Garden State's counsel appeared at the Board's hearing and presented an outline of the application and the relief sought. The Board noted, at the outset, counsel indicated Garden State "was willing to reduce the height of the proposed billboard to 35ft." Further, counsel explained the site was viable because it was "adjacent to a highly trafficked roadway," "not located in close proximity to residential properties," and "there are large signs which exist throughout the surrounding neighborhood." Counsel noted "the TC zone permits on premise signs."

Garden State's counsel explained the "billboard utilizes state[-]of[-]the[-]art technology which ensures that advertisements are only visible to vehicles traveling along the roadway. The advertisements . . . are static and contain no scrolling text, flashing lights, or moving images. The billboard contains an auto-dimmer which will increase/decrease brightness during daytime and nighttime hours." Moreover, the billboard would "advertise both commercial and non-commercial speech" and "serve[] the general welfare of the community" by "market[ing] local businesses and convey[ing] emergency information when needed."

A-3622-23

Garden State presented the testimony of Jason Sciullo, a professional engineer and professional planner with Sciullo Engineering Services, LLC. Sciullo testified regarding the proposed site plan. Sciullo's testimony included a site rendering and "several photographs of the subject property which were received by the Board." Sciullo stated billboards existed along Route 47, however, "those billboards [we]re approximately 96[ feet] wide and are located at ground level whereas the billboard proposed by [Garden State] measures 10.5[ feet] x 36[ feet] and w[ould] be elevated approximately 35[ feet] above grade." Sciullo noted the "advertisements depicted on the proposed billboard will not be visible to residential properties due to auto-dimming features and technology which orients the advertisement so that same is only visible to vehicles on the roadway."

In his testimony, Sciullo "cited a 2014 Driver Visual Behavior Study conducted by the National Highway Traffic Safety Administration which evaluated distracted drivers and their responses to billboard advertisements." Based on this study, he opined "billboards are safe and cause limited distractions to drivers."

Further, he "reviewed and discussed the New Jersey Department of Transportation [(NJDOT)] regulations pertaining to billboards." While noting

"ground level billboards have been deemed to be a safety issue and moving/scrolling signs are prohibited by the NJDOT," Sciullo explained Garden State's billboard would "be 35[ feet] tall and it w[ould] not contain scrolling or moving text."

Sciullo testified Garden State was "requesting two D(l) use variances, one to permit two principal uses at the subject property and the other to permit the proposed billboard use." He noted "the TC zone allows signs to have a maximum area of 400[ square feet] in connection with large shopping centers" and the "Board Engineer Vincent Orlando noted that the size of shopping center signs is tied to the size of the lot and the size of the building which allows for larger signs in connection with larger scale shopping centers."

In support of Garden State's advancing "the purposes of zoning, outlined within N.J.S.A. 40:55D-2," Sciullo testified it:

> a. Encourages municipal action to guide the appropriate use or development of all lands in this State, in a manner which will promote the public health, safety, morals, and general welfare;
>
> b. Secures safety from fire, flood, panic and other natural and man-made disasters;
>
> g. Provides sufficient space in appropriate locations for a variety of agricultural, residential, recreational, commercial and

industrial uses and open space, both public and private, according to their respective environmental requirements in order to meet the needs of all New Jersey citizens; and

m. Encourages coordination of the various public and private procedures and activities shaping land development with a view of lessening the cost of such development and to the more efficient use of the land.

In addition, Sciullo testified "the application can be granted as there are no substantial detriments to the public good and the application d[id] not impair the intent or purpose of the Township's zone plan or zoning ordinance." Further, "the proposed billboard . . . advance[d] several goals and objectives outlined within the Township Master Plan" because "it support[ed] existing businesses," would "provide financial assistance to the owner of the subject property to assist with the redevelopment of the entire site," and "serve[d] the general welfare of the community."

Board members questioned whether the billboard could be relocated to a different location. However, Sciullo "testified that billboards [we]re prohibited from being located" in the suggested location, as the location was "designated as a historic site." Further, "Board Members expressed significant concerns about the size of the proposed billboard in relation to the surrounding

27

neighborhood. Board Members took issue with the fact that the proposed billboard would be significantly larger than any existing sign located in the surrounding neighborhood and would not be consistent with same."

In response, Garden State indicated it was "willing to reduce the size and height of the proposed billboard in order to address the concerns raised by the Board." Counsel advised the Board that Garden State would "reduce the size of the proposed billboard to 10.5[ feet] x 30[ feet]." After additional discussion, Garden State indicated it would "further reduce the size of the proposed billboard to 12[ feet] x 25[ feet] and reduce [its] height . . . to 30[ feet]."

Nevertheless, the Board "continued to take issue with the size of the proposed billboard" because it "would still significantly exceed the size of all existing signs located in the surrounding neighborhood."

After the conclusion of Garden State's presentation, a neighboring property owner testified that he was concerned regarding the "impact that the proposed billboard would have on the surrounding community" and "was opposed to the size and location of the proposed billboard." No members of the public provided any other comments in support or opposition to the application.

The Board accepted Sciullo "as an expert in the fields of engineering and land planning" and found his testimony to be credible. Nevertheless, during the

Board's deliberations its members continued to "express[] concerns in connection with the [a]pplication and the relief sought." The "Board Members agreed that the subject property [wa]s not particularly suited to accommodate the proposed use as the size of the billboard proposed . . . [wa]s significantly larger than the size of permitted and existing signs in the surrounding TC zone."

The Board expressed concerns "in relation to the height of the proposed billboard and the overall size of same and the impact that it would have on neighboring properties and vehicle traffic in the neighborhood" and "in relation to public safety and the impact that the rotating advertisements would have on vehicle safety and the general public."

The Board found "that the purposes of zoning . . . would not be advanced in connection with th[e] application and same d[id] not support the relief requested"; "the proposed billboard would impair the intent and purpose of the zone plan and zoning ordinance as same presents a substantial detriment to the aesthetics of the neighborhood"; and "the proposed development would be detrimental to the surrounding neighborhood . . . [because] the requested variances were not appropriate and were contrary to the Township's Master Plan, its Zoning Ordinance, and the TC Zone Plan."

The Board "determined that the relief requested" could not "be granted without substantial detriment to the public good and without substantially impairing the intent and purpose of the zoning plan and zoning ordinance," and denied Garden State's application.

In conducting its review, the trial court considered the witnesses' testimony, the Board members' deliberations, and the Board's resolution denying Garden State's application. The court reviewed the application under N.J.S.A. 40:55D-70(d).

The trial court considered "whether there was evidence in the record supporting the Board's determination that [Garden State] did not overwhelmingly meet all three prerequisites to obtaining variance relief." The court stated, "even if [Garden State] met all the positive criteria . . . [it] d[id] not satisfy the negative criteria because the application diverges from the Township's ordinance and zoning plan."

The trial court noted the Township's concession that the "TC zoning district permit[ted] billboards up to 400 square feet" but also noted "those signs [w]ere located within large centers." Further, the court found "the Township's Master Plan . . . ha[d] long been in existence and expresses a consistent will of

30                                                                              A-3622-23

the Township's residents throughout the ages to preserve the open air and aesthetic beauty and nature of the Township." The court concluded:

> Board's enjoy great deference and [Garden State] has the heavy burden of proving that the evidence presented to the [B]oard was so overwhelming in favor of the applica[tion] that the [B]oard's action can be said to be arbitrary, capricious, or unreasonable. The Board's record contains that even at [a] reduced size . . . , the proposed billboard is at odds with Township zoning interests. Accordingly, [Garden State] has failed to satisfy the negative criteria articulated in N.J.S.A. 40:55D-70. Thus, the Board's denial of [Garden State]'s application was not arbitrary, capricious, or unreasonable.

On appeal, Garden State argues the trial court erred because the Board "lacked substantial evidence to deny the [a]pplication." Garden State contends it "established that the [p]roperty is particularly suited for the Billboard and that its location will mitigate the purported negative effects normally associated with it." It avers the Board's "planner conceded, the [b]illboard is consistent with larger signs for on-premises speech" and "[t]he trial court agreed that Garden State satisfied the positive criteria."

In addition, Garden State contends it also satisfied the "negative criteria" because "the zoning effect of on-premises versus off-premises speech is the same . . . the zoning itself acknowledges the ability of the zone to accommodate a [b]illboard because it already permits on-premises speech"; "[d]igital

31

billboards now allow dimming and other technological features to address the purported 'problems' of static billboards"; "the 'safety concerns' . . . were rejected in E & J Equities and rejected in unrebutted testimony by Garden State[]"; and "the [b]illboard is consistent with the height limitation for principal uses in the zone."

"Our standard of review for the grant or denial of a variance is the same as that applied by the Law Division." Advance at Branchburg II, LLC v. Branchburg Twp. Bd. of Adjustment, 433 N.J. Super. 247, 252 (App. Div. 2013) (citing Bressman v. Gash, 131 N.J. 517, 529 (1993)). "The role of a court reviewing a decision by a board of adjustment is strictly circumscribed[.]" N.Y. SMSA Ltd. P'ship v. Bd. of Adjustment of Bernards, 324 N.J. Super. 149, 164 (App. Div. 1999). "[B]ecause of their peculiar knowledge of local conditions," local boards are "allowed wide latitude in the exercise of their delegated discretion." Booth v. Bd. of Adjustment of Rockaway Twp., 50 N.J. 302, 306 (1967). A board's actions are thus presumed valid, and "the party attacking such action has the burden of proving otherwise." N.Y. SMSA Ltd. P'ship, 324 N.J. Super. at 163.

"It is well-settled that a decision of a zoning board may be set aside only when it is 'arbitrary, capricious or unreasonable.'" Cell S. of N.J., Inc. v. Zoning

Bd. of Adjustment, 172 N.J. 75, 81 (2002) (quoting Medici v. BPR Co., 107 N.J. 1, 15 (1987)). "[A]rbitrariness or unreasonableness . . . have been interpreted to mean 'willful and unreasoning action, without consideration and in disregard of circumstances.'" Seaview Harbor Realignment Comm., LLC v. Twp. Comm., of Egg Harbor, 470 N.J. Super. 71, 94 (App. Div. 2021) (quoting D'Anastasio Corp. v. Twp. of Pilesgrove, 387 N.J. Super. 247, 251 (Law Div. 2005)).

A "[b]oard's factual conclusions are entitled to great weight and . . . ought not be disturbed unless there is insufficient evidence to support them." Rowatti v. Gonchar, 101 N.J. 46, 52 (1985). However, "[w]e are ordinarily not bound by an agency's determination on a question of law." Advance at Branchburg, 433 N.J. Super. at 252 (citing In re Distrib. of Liquid Assets, 168 N.J. 1, 11 (2001)). Further, "a municipal board's construction of its own ordinances is reviewed de novo." Ibid. We "[n]evertheless, . . . 'recognize the board's knowledge of local circumstances and accord deference to its interpretation.'" Id. at 252 (quoting Fallone Props., LLC v. Bethlehem Twp. Plan. Bd., 369 N.J. Super. 552, 562 (App. Div. 2004)).

"Where there is room for two opinions, action is [valid] when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached." Worthington v. Fauver, 88 N.J. 183,

204-05 (1982) (alteration in original) (quoting Bayshore Sewerage Co. v. Dep't Env't Prot., 122 N.J. Super. 184, 199 (Ch. Div. 1973)). Therefore, "[t]he court will not substitute its judgment for that of the board, and the board's action will be set aside only if the court finds a clear abuse of discretion." N.Y. SMSA Ltd. P'Ship, 324 N.J. Super. at 164.

Under N.J.S.A. 40:55D-70(d)(1), the Board has the power to "[i]n particular cases for special reasons, grant a variance to allow departure from regulations . . . to permit[] . . . a use . . . in a district restricted against such use . . . ." However,

> [n]o variance or other relief may be granted under the terms of this section, including a variance or other relief involving an inherently beneficial use, without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.
>
> [Ibid.]

"The statute requires proof of both positive and negative criteria." Sica v. Bd. of Adjustment of Wall, 127 N.J. 152, 156 (1992). As to "positive criteria, the applicant must establish 'special reasons' for the grant of the variance." Ibid. "The negative criteria require proof that the variance 'can be granted without

34

substantial detriment to the public good' and that it 'will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.'" Ibid.

In determining whether a board properly exercised its discretion, "[c]ourts give greater deference to variance denials than to grants of variances, since variances tend to impair sound zoning." Med. Ctr. at Princeton v. Twp. of Princeton Zoning Bd. of Adjustment, 343 N.J. Super. 177, 199 (App. Div. 2001). "Where a board of adjustment has denied a variance, the plaintiff has the heavy burden of proving that the evidence presented to the board was so overwhelmingly in favor of the applicant that the board's action can be said to be arbitrary, capricious or unreasonable." Med. Realty Assocs. v. Bd. of Adjustment of Summit, 228 N.J. Super. 226, 233 (App. Div. 1988).

Under N.J.S.A. 40:55D-10(g)(2), the Board is required to pass a resolution and "include findings of fact and conclusions based thereon in each decision on any application for development and shall reduce the decision to writing." "It is the resolution, and not [the] board members' deliberations, that provides the statutorily required findings of fact and conclusions." N.Y. SMSA, L.P. v. Bd. of Adjustment of Weehawken, 370 N.J. Super. 319, 334 (App. Div. 2004).

"Zoning boards may choose which witnesses, including expert witnesses, to believe." Bd. of Educ. of Clifton v. Zoning Bd. of Adjustment of Clifton, 409

N.J. Super. 389, 434 (App. Div. 2009). "However, to be binding on appeal, that choice must be reasonably made." Ibid. "In addition, the choice must be explained" and "[t]he board cannot rely upon unsubstantiated allegations." Id. at 434-35.

Applying these well-established principles, we conclude Garden State failed to establish the Board's denial was arbitrary, capricious, or unreasonable. The Board's resolution clearly stated its conclusion that Garden State failed to establish the positive and negative criteria. The Board's decision is adequately supported by the factual record. We will not substitute our judgment for the Board's. Moreover, Garden State has not provided "overwhelming" evidence to convince us that the Board's denial was arbitrary, capricious, or unreasonable. See Med. Realty Assocs., 228 N.J. Super. at 233.

To the extent we have not addressed any other arguments raised by Garden State, we are satisfied they are without sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division

A-3622-23